1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VICKY CLOSE,

                         Plaintiff,

     v.

PENNEY OPCO LLC et al.,

                      Defendant.

CASE NO. 3:24-cv-05756-DGE

ORDER ON MOTION TO COMPEL
ARBITRATION (DKT. NO. 13)

## I       INTRODUCTION

      This matter comes before the Court on Defendant's motion to compel arbitration. (Dkt.

No. 13.) For the foregoing reasons, the motion is DENIED.[1]

---

[1] Although the instant motion is denied, the Court anticipates that the litigation will be stayed pending resolution of a materially identical case that originated in the Eastern District of Washington: *Montes v. Sparc Group, LLC*, which the Ninth Circuit recently certified to the Washington Supreme Court. (*See* 2:22-cv-00201-TOR, Dkt. No. 32.) In *Montes*, the panel certified the following question: "When a seller advertises a product's price, coupled with a misrepresentation about the product's discounted price, comparative price, or price history, does a consumer who purchases the product because of the misrepresentation suffer an 'injur[y] in his

## II    BACKGROUND

On September 9, 2024, Plaintiff Vicky Close filed a complaint alleging that "[f]or years, JCPenney has engaged in a massive false discount advertising scheme across nearly all of its products on both its website and in its retail stores." (Dkt. No. 1 at 2.) "JCPenney's deceptive pricing scheme is intended to trick consumers into believing that its products are worth, and have a market value equal to, the inflated list price, and that the lower advertised 'sale' price represents a special bargain," Plaintiff argues. (*Id*.) Plaintiff alleges that she was harmed by the scheme when she bought the Multi Sac North/South Zip Around Crossbody Bag, which was advertised as marked down from $50 to $20. (*Id*. at 24.) "In reality, and unbeknownst to Ms. Close, JCPenney had never offered the Bag at the purported regular price of $50," Plaintiff argues; indeed, in the weeks prior to her purchase, it was offered for $14. (*Id*. at 25.) Accordingly, Plaintiff claims the advertised reference price constituted a material misrepresentation that induced her to purchase the bag for more money than it was worth, resulting in a loss of money. (*Id*.) Plaintiff seeks individual relief and relief on behalf of a proposed class of Washington consumers who purchased one or more products advertised with a discount from JCPenney. (*Id*. at 3.) She brings one cause of action under the Washington Consumer Protection Act (WCPA) and seeks injunctive relief and money damages. (*Id*. at 27–32.)

On January 17, 2025, Defendant moved to compel arbitration. (Dkt. No. 13.) Defendant advances two arguments. First, Defendant asserts that because Plaintiff was a JCPenney Rewards member and had agreed to be bound by the arbitration provision in JCPenney's

---

or her business or property' under Wash. Rev. Code §§ 19.86.020 and 19.86.090 if the consumer pays the advertised price?" (*Id*. at 2.)

1  Rewards Program, this dispute must be pursued in arbitration.  (Dkt. No. 13 at 2–3.)  Second,

2  Defendant claims that because Plaintiff purchased the bag on the JCPenney website—which

3  displayed a link to Terms and Conditions at the bottom of the page that, if clicked, included a

4  section containing an agreement mandating arbitration—the claims must go to arbitration.  (*Id*. at

5  3.)  In sum, "this Court should enforce the arbitration provisions governing Plaintiff's

6  transactions and compel her to pursue her claims in arbitration," Defendant argues.  (*Id*.)

7                              **III      DISCUSSION**

8          **A.  Legal Standard**

9          The Federal Arbitration Act ("FAA") applies to contracts "evidencing a transaction

10  involving commerce."  9 U.S.C. § 2; *Brennan v. Opus Bank*, 796 F.3d 1125, 1129 (9th Cir.

11  2015).  In considering a motion to compel arbitration, the "court's role under the [FAA] . . . is

12  limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2)

13  whether the agreement encompasses the dispute at issue."  *Chiron Corp. v. Ortho Diagnostic*

14  *Sys., Inc*., 207 F.3d 1126, 1130 (9th Cir. 2000).[2]  These gateway issues, however, "can be

15  expressly delegated to the arbitrator where 'the parties clearly and unmistakably provide

16  otherwise.'"  *Brennan*, 796 F.3d at 1130 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of*

17  *Am*., 475 U.S. 643, 649 (1986)).

18          The party seeking to compel arbitration under the FAA bears the burden of proving by a

19  preponderance of the evidence the existence of an agreement to arbitrate.  *Ashbey v. Archstone*

20  *Prop. Mgmt., Inc*., 785 F.3d 1320, 1323 (9th Cir. 2015); *Knutson v. Sirius XM Radio Inc*., 771

21  _____

22  [2] Section 4 of the FAA provides a judicial remedy where a party seeks to compel arbitration.  *See*
    9 U.S.C. § 4.  Under Section 4, "[a] party aggrieved by the alleged failure, neglect, or refusal of

23  another to arbitrate under a written agreement for arbitration may petition any United States
    district court which, save for such agreement, would have jurisdiction . . . of the subject matter of

24  a suit arising out of the controversy between the parties," for an order compelling arbitration.  *Id.*

1    F.3d 559, 565 (9th Cir. 2014).  "Arbitration is a matter of contract, and the FAA requires courts

2    to honor parties' expectations." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011).

3    Accordingly, when deciding whether the parties agreed to arbitrate a certain claim (including

4    arbitrability itself), courts "apply ordinary state-law principles that govern the formation of

5    contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("Courts should

6    not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and

7    unmistakabl[e]' evidence that they did so.").  Likewise, "generally applicable contract defenses,

8    such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements."

9    *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).  "Any doubts about the scope of

10   arbitrable issues, including applicable contract defenses, are to be resolved in favor of

11   arbitration." *Tompkins v. 23andMe, Inc*., 840 F.3d 1016, 1022 (9th Cir. 2016).[3]

12       **B.  Discussion**

13          1.  The Rewards Program

14       Plaintiff does not contest that she joined the JCPenney Rewards Program on or around

15   July 12, 2014.  (Dkt. No. 22 at 2.)  When she enrolled, she agreed to the Rewards Program

16   Terms and Conditions that were in effect at that time.  (*Id*.)  Plaintiff states that the 2014 version

17   of the Terms and Conditions is the only version of the Rewards Program Terms and Conditions

18   that she has ever seen or agreed to.  (*Id*.)  The 2014 Terms and Conditions provided, in relevant

19   part:

20

21   _____

[3] Similarly, Washington's Uniform Arbitration Act ("UAA") provides: "On motion of a person

22   showing an agreement to arbitrate and alleging another person's refusal to arbitrate pursuant to
     the agreement . . . [i]f the refusing party opposes the motion, the court shall proceed summarily

23   to decide the issue. Unless the court finds that there is no enforceable agreement to arbitrate, it
     shall order the parties to arbitrate. If the court finds that there is no enforceable agreement, it may

24   not order the parties to arbitrate." Wash. Rev. Code. § 7.04A.070.

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 13) - 4

Membership is non-transferable and is subject to present and future program Terms as described below . . . . This Agreement will be governed by and construed under the substantive laws of the State of Texas, without reference to conflict-of-laws considerations. **JCPenney and Member each agree that any dispute, claim, or controversy ("Claim") arising from or relating to this Agreement or Member's jcp rewards Membership will be resolved by binding arbitration** conducted in the State of Texas (Collin County). JCPenney and Member each acknowledge and agree that each has chosen arbitration rather than litigation to resolve any such dispute, claim, or controversy. JCPenney and Member each understand that a judgment, on any arbitral award may be entered in any court having jurisdiction. Member will not have the right to participate in a representative capacity or as a member of any class of claimants pertaining to any Claim subject to arbitration. There shall be no right or authority for any Claims to be arbitrated on a class action basis or on any basis involving Claims brought in a purported representative capacity on behalf of the general public or other persons or entities similarly situated.

(Dkt. No. 13-5) (emphasis added).

By December of 2023—when Plaintiff made her purchase—JCPenney had updated the Rewards Program Terms and Conditions. (Dkt. No. 13-7.) At that time, they provided, in relevant part:

**Any dispute or claim arising out of or relating in any way to a Member's participation in the Program, including, without limitation, the issuance of Points, the issuance or redemption of Rewards, or the receipt of any Program benefits, will be resolved by binding arbitration**, rather than in court, except that a Member may assert claims in small claims court if the Member's claims qualify. . . . The Federal Arbitration Act and federal arbitration law apply to this agreement to arbitrate. . . . JCPenney and Member each hereby waive the right to participate in any class action, whether in court or arbitration. . . . The arbitration will be conducted by the American Arbitration Association (AAA) under its rules, including the AAA's Consumer Arbitration Rules.

(*Id*. at 7–8) (emphasis added).

Defendant first argues that "[t]he Rewards Program Terms & Conditions represent an enforceable arbitration contract under Washington law." (Dkt. No. 13 at 10.) Next, Defendant asserts that the Court should not resolve the scope of the arbitration agreement—*i.e.*, whether it covers Plaintiff's claims—but rather leave the question of arbitrability for the arbitrator. (*Id*. at 14.) This argument follows from the fact that the 2023 Terms and Conditions reference the rules

1    of the AAA, which provide that the arbitrator has the power to rule on the *scope* of the

2    arbitration agreement or arbitrability of a claim.  (*Id*. at 14; Dkt. No. 25 at 6–7.)  "The Ninth

3    Circuit has directly held that such delegation clauses make questions about the scope of an

4    arbitration agreement questions for the arbitrator, not the Court," Defendant states.  (*Id*. at 15)

5    (citing *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022)).

6          In response, Plaintiff points out that the 2014 Terms do not reference the AAA rules and

7    argues that Plaintiff is only bound to the 2014 Terms (which do not indicate a delegation of the

8    gateway arbitrability question).  (Dkt. No. 21 at 15.)  Contract modifications require notice and

9    assent under Washington law, Plaintiff emphasizes, and Plaintiff was not informed that the

10   Terms and Conditions she signed in 2014 had been updated.  (*Id*.)  Indeed, in Washington, the

11   "mere fact that [a company] reserved the right to later change or add terms [to a contract]," does

12   not bind a customer to any changed or additional terms without notice.  *Hunichen v. Atonomi*

13   *LLC*, No. C19-0615-RAJ-MAT, 2019 WL 7758597, *8 (W.D. Wash. Oct. 28, 2019); *Gaglidari*

14   *v. Denny's Restaurants, Inc*., 815 P.2d 1362 (Wash. 1991) ("Plaintiff is not bound by defendant's

15   unilateral revisions of company policy unless defendant gave her reasonable notice of the

16   changes").  Thus, Plaintiff is not bound to the 2023 terms under Washington law.  Defendant

17   replies that Texas law governs whether or not Plaintiff is bound because of the choice of law

18   provision in the contract. (Dkt. No. 24 at 7.)  Accordingly, the Court turns to Texas law.

19         Under Texas contract law, if one contracting party "can unilaterally modify or terminate

20   the purported arbitration agreement without prior notice to [the other party], that agreement is

21   based upon an illusory promise and thus not enforceable."  *ACE Cash Express, Inc. v. Cox*, No.

22   05-15-01425-CV, 2016 WL 4205850, *5 (Tex. App. Aug. 9, 2016).  In the 2014 Terms,

23   JCPenney specifically reserved the right "without limitation" to "terminate, change, limit,

24

1  modify, or cancel any Program rules, regulations, benefits or conditions of participation at any

2  time, ***with or without notice***[.]" (Dkt. No. 13-5 at 5) (emphasis added). The 2023 Terms include

3  a similar provision. (Dkt. No. 13-7 at 6.) Accordingly, JCPenney could have "terminated" the

4  requirement that disputes would be resolved via arbitration. Indeed, the Terms and Conditions

5  document emphasizes that this sort of change could occur at any time without notice. (*See* Dkt.

6  No. 13-5 at 5) ("You waive any right you may have to receive specific notice of such changes.").

7  Thus, a plain reading of the contract suggests that the arbitration agreement is illusory under

8  Texas law. As the Texas Supreme Court has commented: "if a party retains the unilateral,

9  unrestricted right to terminate the arbitration agreement, it is illusory." *J.M. Davidson, Inc. v.*

10  *Webster*, 128 S.W.3d 223, 230 n.2 (Tex. 2003).

11        Texas courts have found that a contract is not illusory if it requires *notice* of a

12  modification or provides that any such amendment will only apply prospectively. *Id.* at 230;

13  *Budd v. Max Intern., LLC*, 339 S.W.3d 915, 920 (Tex. App. 2011) ("any amendments did not

14  become effective until . . . after . . . notice of the modification" and "any amendment to . . . the

15  arbitration agreement would not apply retroactively to claims pending at the time of the

16  amendment"); *In re Polymerica, LLC*, 296 S.W.3d 74 (Tex. 2009) (because contract required

17  notice and applied prospectively only, it was not illusory). In other words, "a modification

18  provision does not render an arbitration contract illusory [under Texas law] if (1) an amendment

19  exempts a claim of which the [party] has actual notice (knowledge) on the effective date of the

20  change, and (2) the termination of the arbitration contract exempts a claim that arose (accrued)

21  before the date of termination." *Peleg v. Neiman Marcus Grp., Inc*., 140 Cal. Rptr. 3d 38, 54

22  (2012) (Cal. App. 2012) (construing a contract with similar choice-of-law language). Because

23  no such notice or exemption provisions exist in the Terms and Conditions, it appears that no

24

legally cognizable agreement to arbitrate exists between the Parties under Texas law. *See also Carey v. 24 Hour Fitness, USA, Inc*., 669 F.3d 202 (5th Cir. 2012) ("if the other party can suddenly change the terms of the agreement to avoid arbitration, then the agreement was illusory from the outset."). For this reason, Defendants motion to arbitrate pursuant to the 2014 and/or 2023 Terms and Conditions fails.

　　　　Assuming arguendo that Plaintiff is bound under the 2014 Terms and Conditions, it is clear that Plaintiff's claims do not fall within the scope of the arbitration provision. Because the Terms and Conditions provide that the agreement is governed and construed under Texas law, Texas law once again guides the Court's analysis. In determining whether Plaintiff's claims fall within the arbitration agreement's scope, the Court focuses on the complaint's factual allegations. *In re FirstMerit Bank*, N.A., 52 S.W.3d 749, 754 (Tex. 2001). Recall that Plaintiff's claims are based on her allegedly falling victim to Defendants' deceptive discount price scheme when she purchased a bag for more than it was worth. (Dkt. No. 1 at 24–25.) The arbitration clause at issue provides: "any dispute, claim, or controversy ("Claim") arising from or relating to this Agreement or Member's jcp rewards Membership will be resolved by binding arbitration." (Dkt. No. 13-5.) Plaintiffs' allegations about the allegedly false advertised discounts not do not "arise from" or "relate" to her membership in the rewards program or the number of points she received for her purchases. The Tenth Circuit came to this exact conclusion in considering a materially identical case that involved allegations of fake discounts at JCPenney and a Plaintiff who had joined the rewards program in 2014. As the Tenth Circuit explained, "applying a plain grammatical meaning of the contract to the facts of this case, it appears the parties did not intend to have facts like those alleged in [Plaintiff's] complaint to fall within the 2014 Rewards Program agreement's arbitration provision." *Cavlovic v. J.C. Penney Corp., Inc*., 884 F.3d 1051,

1   1060 (10th Cir. 2018) (internal citations and quotations omitted.)  "The mere existence of the

2   Rewards Program agreement is not itself sufficient to conclude that [Plaintiff's] allegations of

3   deceptive advertising arise from or relate to that contract."  *Id.*  So too here.  Plaintiff's claims do

4   not fall within the scope of the arbitration agreement, as multiple courts have now concluded.

5   Thus, JCPenney's motion to compel arbitration pursuant to those terms fails.

6           2.   The Website Terms and Conditions

7           JCPenney states that "[u]se of JCPenney.com is governed by the Terms of Use applicable

8   to the website," which can be found by following a link displayed at "the bottom of each page on

9   the site." (Dkt. No. 13 at 5.)  If a customer clicks the click, they are directed to the Terms and

10  Conditions page.  (*Id.*)  The page includes a disclosure, which states: "By using this website or

11  our mobile application (together, the "Website"), you agree to be bound by these Terms of Use

12  and our Privacy Notice.  Please read them carefully, as they contain important provisions relating

13  to your use of this Website, including an agreement to engage in binding arbitration to resolve

14  any disputes between us and class action waiver." (Dkt. No. 13-2 at 2.)  The Terms of Use on

15  the Terms and Conditions page provides: "Any dispute or claim arising out of or relating in any

16  way to your use of this Website, to any purchases made through this Website, or to the sale of

17  any products or services sold or distributed by JCPenney on this Website, will be resolved by

18  binding arbitration, rather than in court." (*Id.* at 6.)  Defendant argues that the arbitration

19  agreement in the Terms of Use is binding on Plaintiff.  (Dkt. No. 13 at 6.)

20          Recall that Defendant bears the burden of proving by a preponderance of the evidence the

21  existence of an agreement to arbitrate.  *Ashbey*, 785 F.3d at 1323.  When deciding this question,

22  courts "apply ordinary state-law principles that govern the formation of contracts."  *Kaplan*, 514

23  U.S. at 944 (1995).  The Parties agree that "[t]he threshold question here is thus whether

24

JCPenney and Plaintiff formed arbitration contracts under Washington law." (Dkt. Nos. 13 at 8; 21 at 13; 24 at 15.) Neither argue that Texas contract law applies.

The Terms of Use is a typical "browsewrap agreement," where "a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Nguyen v. Barnes & Noble Inc*., 763 F.3d 1171, 1176 (9th Cir. 2014). "The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." *Id*. (quoting *Be In, Inc. v. Google Inc*., No. 12–CV–03373–LHK, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013). "Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Id*. "Several courts have observed that the law of other jurisdictions is similar to Washington law on this topic." *Wilson v. Huuuge, Inc*., 351 F. Supp. 3d 1308, 1313 (W.D. Wash. 2018), aff'd, 944 F.3d 1212 (9th Cir. 2019) (collecting cases).

The Ninth Circuit has held "the validity of [a] browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Nguyen,* at 763 F.3d at 1179. On the one hand, "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Id*. In contrast, "[c]ourts have consistently enforced browsewrap agreements where the user had actual notice of the agreement." *Id*. at 1176. "The key question in such situations is whether the website or app adequately informs a reasonable user that by

1  clicking a certain button they are also agreeing to be bound by the terms." *Wilson*, 351 F. Supp.

2  3d at 1314.  This accords with Washington law, under which "'nonsignatories are not bound by

3  arbitration clauses' as a general rule." *Marshall v. Hipcamp Inc.*, 735 F. Supp. 3d 1283, 1294

4  (W.D. Wash. 2024) (quoting *Townsend v. Quadrant Corp.*, 268 P.3d 917 (Wash. 2012)).  This

5  principle stems from the fact that "arbitration is a matter of contract and a party cannot be

6  required to submit to arbitration any dispute which he has not agreed so to submit." *Satomi*

7  *Owners Ass'n v. Satomi*, LLC, 225 P.3d 213, 229 (Wash. 2009).

8         Plaintiff attests that: "I did not know about the Terms of Use on JCPenney's website

9  before or at the time I made my purchase on December 23, 2023" and "I did not before or at the

10  time I made my purchase on December 23, 2023, click on any hyperlink at the bottom of the

11  JCPenney website that took me to the Terms of Use."  (Dkt. No. 22 at 4.)  In contrast, Defendant

12  asserts only that "Plaintiff was necessarily presented with the link to the Terms of Use when she

13  made her purchase."  (Dkt. No. 13-1 at 2.)  But Defendant provides no information as to when,

14  where, how, or in what format Plaintiff was presented or required to review the Terms of Use

15  when making the purchase at issue.  Thus, there is no indication that Plaintiff had knowledge or

16  notice of—or agreed to—the Terms of Use on the website.  The Terms and Conditions link in

17  question is quite literally "buried at the bottom of the page," in very small grey font.  *Nguyen*,

18  763 F. 3d at 1177.  (*See* Dkt. No. 23-3 at 6.)  The link would not have been visible to Plaintiff

19  without scrolling down to the bottom of the screen—which is not an action required by the

20  purchase process.  *C.f. id*. (citing *Hines v. Overstock.com, Inc.*, 668 F.Supp.2d 362, 367

21  (E.D.N.Y. 2009).[4]  Moreover, "even close proximity of the hyperlink to relevant buttons users

22

23  _____
    [4] Plaintiff disputes the link's presence on the page where she purchased the bag and argues that
    the site displayed the SMS Terms and Conditions rather than the Website Terms and Conditions.
24  (Dkt. No. 23 at 4.)  This is ultimately irrelevant, however, as even if the website displayed the

ORDER ON MOTION TO COMPEL ARBITRATION (DKT. NO. 13) - 11

1    must click on—without more—is insufficient to give rise to constructive notice." *Id*. at 1179.

2    Ultimately, this fact pattern does not represent a close case.  There is no legal mandate that

3    consumers "ferret out hyperlinks to terms and conditions to which they have no reason to suspect

4    they will be bound." *Id*.

5           Because Defendant has not carried its burden of proving the existence of an agreement to

6    arbitrate, the motion to compel arbitration pursuant to the Website Terms and Conditions is

7    DENIED.  *See Ashbey*, 785 F.3d at 1323.

8                     **IV**      **CONCLUSION**

9           Accordingly, the motion to compel arbitration (Dkt. No. 13) is DENIED.

10           Dated this 20th day of June, 2025.

11

12

13                              David G. Estudillo
                                 United States District Judge

14

15

16

17

18

19

20

21

22

23    ———————————
    Terms, the Court cannot find that Plaintiff held the requisite knowledge to be bound by the

24    agreement.